## ALFORD v. NATIONAL LIFE & ACCIDENT INS. CO., Inc.

### No. 17242.

Court of Appeal of Louisiana. Orleans.

Jan. 9, 1940.

Rehearing Denied Jan. 22, 1940.

Porteous, Johnson & Humphrey, of New Orleans, for appellant.

Chas. J. Mundy, of New Orleans, for appellee.

WESTERFIELD, Judge.

Lizzie Alford, the beneficiary under a policy of accident insurance issued to Solomon Skinner, alleging that Skinner died as a result of accidental injury, brings this suit for $150, the principal sum mentioned in the policy. The defendant, the National Life & Accident Insurance Company, Inc., admitted the issuance of the policy, the death of the insured and other allegations of the plaintiff's petition relying upon a special defense to the effect that the death of the insured was not accidental but intentional and, therefore, not covered by the policy.

There was judgment below in favor of plaintiff as prayed for and defendant has appealed.

Solomon Skinner was killed on May 30th, 1937, as a result of a gun-shot wound inflicted by Pleny Eaglin known throughout this record as "Plenty Eagle". The question presented by this appeal is whether Skinner was shot by Plenty Eagle intentionally or accidentally. The pertinent policy provision provides for the indemnification of the insured or his beneficiary if the accident or death be caused "directly (and independently of all other causes) from a bodily injury, * * * effected accidentally and through external and violent means (excluding suicide, sane or insane and injuries fatal or non-fatal, intentionally inflicted upon the insured by himself or by any other person except by burglars or robbers) * * *".

Defendant admits that it must bear the burden of proof.

Solomon Skinner was "one of a whole bunch of negroes" who were patronizing the barroom and dice game of Nat Cado, on Saturday Night, May 29th, 1937. Cado's establishment is situated at the intersection of two Streets with saintly names, St. Thomas and St. James, but there was little else about it, or its patrons, of saintly character. At about 1:15 a. m. Sunday,

May 30th, 1937, Plenty Eagle and other occupants of Cado's establishment became intoxicated and Plenty Eagle, as a result of real or fancied offense, killed a woman, Evelyn Preston, and a man, Solomon Skinner, and injured another man, Edwin Bolds. The eye witnesses to the occurrence, with the exception of Plenty Eagle who did not testify, were Edwin Bolds, who survived, Frank Collins and Luther Norwood. They testified in effect that Plenty Eagle intended to shoot Edwin Bolds, but that Solomon Skinner suddenly appeared in the line of fire and was accidentally killed. Their testimony varies in unimportant particulars, but in substance it is very similar and, if reliable, would sustain plaintiff's case. However, each had given a statement to the police at about the time of the killing which cannot be reconciled with their testimony and which is destructive of plaintiff's contention. Which should we believe?

Our attention is called to the cases of Passera v. United States Guarantee Co., 187 So. 345, and Galt v. Travelers' Insurance Co., 141 So. 105, 109, where we recognized the general rule to the effect that the sworn declarations of witnesses upon the stand should prevail over unsworn statements which contradict their testimony, and that sworn contradictory statements will not be accepted by the Courts as conclusively impeaching the testimony of a witness. In both instances, however, we pointed out that the Courts "will look to the facts and circumstances and the evidence in each particular case to determine whether or not greater weight and credence will be given to the written statement, or the testimony given in open court", and this is true whether the statements be sworn to or otherwise.

The statements of two of the witnesses were taken down by the desk sergeants in the Precinct Police Stations and witnessed by Captain William P. Dowie and Sergeant John Fedele and Patrolman Joseph Neupert, and in the case of Edwin Bolds, the third witness, whose statement was taken in Charity Hospital, by Sergeant John Fedele and/or Patrolman Joseph Neupert, both of whom were present.

Frank Collins, according to the police, gave the following account: "I would state that at about 1:15 this A. M. Sunday, May 30th, 1937, I was seated at a table with my common-law wife, Emma Russell and Evelyn Preston we were drinking beer at Cado's Beer Garden located at St. Thomas and St. James Streets, Evelyn Preston getting up from the table going out to the sidewalk just outside of the beer garden to see where Benny Boles had went, Evelyn Preston returned to the table where we was seated telling me that Benny Boles was outside fighting with some other negro man, I walked out to the sidewalk to see who was fighting and I noticed that Benny Boles and a negro known as Plenty Eagle fighting. I then got in between the two negroes in an attempt to separate from fighting Boles holding on to Plenty Eagle by his coat and continued to punch on Plenty Eagle, I then noticed Plenty Eagle with a pistol in his hand shooting the first shot struck the negro woman Evelyn Preston in the chest who was also trying to separate the two negro men who were fighting Evelyn Preston fell to the ground, Boles breaking away running out St. James Street to St. Thomas Street when Plenty Eagle fired a shot at Boles striking Boles in the left hip, Boles continued running up St. Thomas Street. Solomon Skinner who was also trying to separate Boles and Plenty Eagle began to run out St. James to St. Thomas Street when Plenty Eagle fired the third shot striking Skinner in the chest and Skinner continued to run up St. Thomas Street. After Plenty Eagle had fired the third shot with the gun in his hand went out St. James towards the river making his escape."

Luther Norwood's statement, the taking of which was postponed for twenty-four hours because he was too drunk to give it immediately after the accident, is to the effect: "I would state that at about 1:30 o'clock A. M. Sunday morning, May 30, 1937, I was in the saloon of Cado's at St. James and St. Thomas Street, drinking with a crowd of other negroes, a colored man I don't know his name came into the saloon and told a colored fellow they call Mule that his wife was out on the sidewalk in a fight, this man who they call Mule then went ouside on the sidewalk I also went outside to see who was fighting and step into the middle of St. James Street I noticed a crowd of women and men on the sidewalk arguing I then noticed Solomon Skinner (c) run from St. James Street to St. Thomas and ran up St. Thomas Street towards Felicity Street and in a few minutes he came back to the corner of St. James and St. Thomas Street where the crowd was and placed his arm and hand in his bosom like he was about to draw

a gun he called to the crowd ho ho and when he said that two shots were fired from the crowd I could not say who fired the shots Solomon Skinner then ran up St. Thomas to Felicity where he fell to the sidewalk I also noticed a colored woman lying on St. James near St. Thomas Street who was also shot I went over and looked at the women I then walked up to Felicity and St. Thomas where Solomon Skinner was lying and when I reached the corner the Charity Hospital ambulance was there and I looked in the ambulance and saw a colored fellow whom I know as Edwards Boles in the ambulance shot I then went back to St. Thomas and St. James Street and was looking at the woman who was shot and another ambulance came and took her away and the police took me to the Second Precinct."

Edwin Bolds' statement reads as follows:

"I would state that at about 1:30 A. M. this date, Sunday May 30th, 1937, I was in Cado's Beer Garden located at the corner of St. James and St. Thomas Street, drinking with a negro Solomon Skinner, and several other negroes when some one called into the beer garden for Solomon Skinner to come outside, and Solomon left the beer garden and walked to the side walk, after a few minutes I walked to the sidewalk to see what was keeping Skinner outside when I noticed Solomon Skinner and a negro known as Plenty Eagle in a clinch fighting I walked over to where the two men was and separated the two men when Plenty Eagle stated that he was going to get his gun, the next thing I knew I was shot in the left hip by the negro known as Plenty Eagle, I then ran to the next corner which is Felicity and St. Thomas Street, after being there a few minutes my friend Solomon Skinner also ran to Felicity and St. Thomas street, when I noticed that he was shot in the chest Skinner fell to the sidewalk.

"I would further stated that on several other occasions Plenty Eagle threatened to shoot Solomon Skinner and myself."

We think this case is the exception to the rule that viva voce testimony of a witness on the stand is to be preferred over previous written sworn or unsworn statements contradictory thereof. It seems to us that the story which the statements tell is more plausible than that elicited from the witnesses on the stand. For example, the testimony of Bolds, who it will be remembered, was one of the victims of Plenty Eagle, is to the effect that he and Plenty Eagle engaged in a fight; that Plenty Eagle shot him in the hip, whereupon he walked away to the corner of St. Thomas and Felicity Streets, where he found Solomon Skinner lying on the sidewalk. He denied having made the statements contained in the police report to the effect that Plenty Eagle had had an altercation with Solomon Skinner and knew nothing about how Skinner met his death. It seems to us most improbable that Sergeant Fedele and Patrolman Neupert, both of whom incidentally took the stand and testified that the statements were read over to the three negroes before they were asked to sign them, would have concocted a story out of the whole cloth about a fight between Solomon Skinner and Plenty Eagle. Moreover, there seems to be no conceivable motive for these officers, even if they were so inclined, to prepare a false statement for the negro Edwin Bolds to sign. It cannot be said, as is sometimes charged, that police officers color the statements which they take of witnesses to crimes in order to aid the prosecution, because these statements when contrasted with the testimony of the witnesses on the stand are obviously more helpful to the murderer than to the prosecution. There was then no thought of an insurance policy. Nor is this a case where an overzealous insurance agent might be inclined to interrogate witnesses so as to obtain a statement most favorable to his employer. Then too, the statements were taken at about the time of the killing, whereas the testimony on the stand was given much later and the recollection of the witnesses is likely to have been keener at the time the statements were made to the police.

Considering the testimony as a whole our conclusion is that Solomon Skinner was very drunk (the coroner's certificate stated that the body reeked with alcohol) and that Bolds and the other negroes concerned were probably drunk also and that a quarrel ensued in which Skinner participated with the result that Plenty Eagle shot him intentionally and not accidentally.

For the reasons assigned the judgment appealed from is annulled, avoided and reversed and it is now ordered that there be judgment herein in favor of the defendant dismissing the plaintiff's suit at her cost.

Reversed.